COBB, Judge.[1]
This case involves a dispute over the amount of maintenance fee charged by an owner/developer against individual lot owners in a mobile home subdivision. The lot owners filed suit against the owner/developer, Continental Country Club, Inc. (CCC), to determine the reasonableness of an increase in the maintenance charge from $65.00 to $135.00 in June 1985 and $137.50 in November 1985. The trial court found in favor of the plaintiffs that the increase was unreasonable and set the maintenance charge at $57.93 for the first disputed time period and $84.00 for the second disputed time period. It also required CCC to assess the same maintenance fee against the units of an adjacent condominium complex (Sandalwood) to which CCC furnishes water and sewer services on a contractual basis. Lastly, the trial court required an adjustment of the maintenance fee every six months. CCC appeals and the plaintiffs below cross-appeal the trial court’s determination that CCC is not a lot owner subject to assessment of the maintenance charge.
Continental Country Club is a mobile home subdivision located in Wildwood, Florida, which contains 1243 platted lots of which 899 are currently developed and 713 are currently occupied. The developed lots are in Phase I and II. Phase III is undeveloped at this time. CCC contains in addition to the residential subdivision, an 18 hole golf course, country club with pro shop, restaurant, and various recreational facilities, including swimming pools, tennis courts, and a ceramics shop. CCC also provides a variety of services to its residents including 24 hour manned security gate, 24 hour security patrol, individual lot and common area lawn maintenance, water and sewer service, garbage and trash collection, recreational facilities and other ser *466 vices. Some of the plaintiffs own vacant lots in the subdivision and reside elsewhere.
The maintenance charge arises out of a recorded set of covenants of deed which are applicable to each lot within the subdivision. The covenants set forth services which will be provided by the developer, obligate the residents to pay for these services, and establish the life-style and operation of the community. The maintenance charge is derived from two subsections of the covenants:
2. DUTIES OF COUNTRY CLUB: Country Club proposes to maintain the grounds and streets, to furnish street lighting, sewage disposal, lawn mowing, garbage pickup, water, recreational and boat storage facilities, to pay taxes and insurance on the recreational facilities and buildings, and to operate and maintain such other private or public facilities from time-to-time as shall be determined by Country Club in its sole discretion to be appropriate for the development of the property.
3. MAINTENANCE CHARGE. To finance the performance of the duties set forth in paragraph 2 above and to assure the continued operation and maintenance of the facilities therein described, all lots shall be subject to a monthly maintenance charge to be determined by Country Club annually (the “Maintenance Charge”). The Maintenance Charge shall be subject to adjustment at any time during the term hereof and shall be effective as far as each owner is concerned upon receipt of an invoice containing a new Maintenance Charge.
CCC’s predecessor in title, who developed the subdivision, charged the lot owners in the subdivision a maintenance charge based on the cost of operating and maintaining the development. The prior owner did not include profit, depreciation or interest expense and subsidized the maintenance charge to keep the cost down to the existing residents and to provide for greater marketability to future residents. The prior owner increased the maintenance charge approximately $10.00 annually from 1979 through 1982. The prior owner sent notices to the lot owners each time it increased the operation and maintenance fee, itemizing the direct costs involved in setting the maintenance charge. The maintenance charge remained at $65.00 from 1982 through 1985.
After a four day non-jury trial, the trial court determined that the covenants did not provide for profits, interest expense, or depreciation to be calculated into the maintenance fee and held that only “actual and reasonable out-of-pocket expenses” could be charged to the lot owners. The court stated that under the intent of the covenants, only those lots which were actually receiving services and maintenance should be charged the current maintenance fee. The undeveloped lots owned, by CCC and certain named individual plaintiffs would not be charged the fee until and unless the lots were hooked up to the water and sewer facilities.
In reviewing the two subsections of the covenants, it is clear that the duties of the CCC are “to furnish street lighting, sewage disposal, lawn mowing, garbage pickup, water, and recreational and boat storage facilities.” The performance of these duties is to be financed by a maintenance charge “to assure the continued operation and maintenance of the facilities” described in paragraph 2.
We can agree with the trial court’s determination that the language in the two covenant paragraphs quoted above does not allow CCC to include in its maintenance fee amounts representing profit or the recapture of capital outlays by depreciation allowances or interest charges. The language in paragraph 3 above clearly states that the purpose of the fee is to continue the operation and maintenance of existing facilities, i.e., those physical facilities such as the sewer plant and water system. As stated by the trial court: “If the intent of the authors of the restrictions was to put purchasers on notice that the cost of construction was to be passed on to them, it would have been a very simple matter to so state.”
*467 However, we believe that the trial court erred in its holding that the plaintiffs below have the right to require CCC to charge the same maintenance fee for each unit of the Sandalwood Condominium as it charges per lot at the Continental Country Club. Sandalwood is a condominium complex adjacent to CCC for which the developer contractually bound itself to provide water and sewer service. The covenants providing for a maintenance charge based on the cost of operation and maintenance of the property, however, apply only to the mobile home subdivision and not to the Sandalwood Condominiums. Unit owners at Sandalwood do not receive the same benefits that the lot owners of the Continental Country Club receive.
It was also error for the trial court to require CCC to adjust the maintenance fee every six months by prorating the charge utilizing the number of occupied lots. This six month recalculation is in direct contravention of the express statement in paragraph 8 of the covenants that the monthly maintenance charge is to be determined annually.
The plaintiffs below, as individual lot owners, have cross-appealed the trial court’s determination that CCC, as developer, is not a lot owner subject to assessment of the maintenance charge. Of the 899 developed lots in Continental County Club, 713 are individually owned and occupied and 186 are retained by CCC. The third paragraph of the covenants, quoted above, states that “all lots shall be subject to a monthly maintenance charge ...” Paragraph 1 of the covenants provides:
1. APPLICATION. These restrictions shall apply to each lot and shall be deemed covenants running with each lot, binding on and enforceable against the owner thereof, his heirs, administrators, successors, assigns, lessees, tenants, licensees, invitees, and occupants thereof, whether acquired by deéd, gift, inheritance, license, lease, adverse possession, or otherwise. (Each such owner and other person being herein called an “Owner”).
In Japanese Gardens Mobile, Inc. v. Hunt, 261 So.2d 193 (Fla. 2d DCA 1972), it was held that a developer was a lot owner under similar deed restrictions. The trial court had held that the term “owners” as used in the deed restrictions was limited to purchasers of a lot excluding the developer. The appellate court reversed, stating that “owner” was not a term of art and could mean only one thing unless qualified in the writing itself. Id. at 196. The Second District concluded that “to admit extrinsic evidence as to some other meaning, or to show by parol that it means one other than the owner of legal or equitable title to the freehold, would be both to create an ambiguity and to rewrite the contract of the parties.” Id. at 196. It is not uncommon for a developer to be held responsible for its pro rata share of the operation and maintenance costs of a development and the defendant should be held responsible in this case also. See Brooks v. Palm Bay Towers Condominium Assoc., Inc., 375 So.2d 348 (Fla. 3d DCA 1979), cert. denied, 386 So.2d 640 (Fla.1980); Margate Village Condominium Assoc., Inc. v. Wilfred, Inc., 350 So.2d 16 (Fla. 4th DCA 1977); Century 21 Commodore Plaza, Inc. v. Commodore Plaza at Century 21 Condominium Assoc., Inc., 340 So.2d 945 (Fla. 3d DCA 1977), cert. denied, 354 So.2d 979 (Fla.1978).
We affirm the trial court’s determinations in regard to exclusion of profits and capital recovery from the maintenance fee and reverse its holding in regard to Sandalwood, semi-annual prorations, and exemption of any lots from the maintenance fee. The judgment below should be amended accordingly.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
SHARP, C.J., and DAUKSCH, J., concur.

. Judge Cobb did not participate in oral argument.